Aaron D. Kronstadt v. Commissioner.
Kronstadt v. Commissioner
Docket No. 37581.
United States Tax Court
T.C. Memo 1954-32; 1954 Tax Ct. Memo LEXIS 214; 13 T.C.M. (CCH) 441; T.C.M. (RIA) 54137; May 10, 1954, Filed Walter H. Maloney, Esq., and Herbert G. Feinson, Esq., 160 Broadway, New York, N. Y., for the petitioner. Paul E. Waring, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in petitioner's income tax and penalties thereon as follows: Year
Deficiency
Penalty
1943
$ 8,164.63
$4,082.32
1944
9,312.16
4,656.08
1945
17,989.21
8,994.61
1946
8,444.06
4,222.03
1947
4,437.65
2,218.83
1948
1,850.79
925.40
*215 The parties presented these issues: (1) Did the respondent err in using the net worth method for determining petitioner's taxable income from 1943 through 1948? (2) If the net worth method is acceptable, did respondent correctly determine petitioner's taxable income? (3) Are any of the years barred by the statute of limitations? (4) Was any part of the deficiencies due to fraud with intent to evade tax under section 293(b), I.R.C.? Some of the items in the net worth statement were in dispute, and we shall consider them under the second issue. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. For the years before us prior to January 1946, petitioner lived in the District of Columbia, but sometime thereafter he moved to New York. He filed his returns for the years 1943 through 1948 with the collector of internal revenue for the district of Maryland. During the first three years before us and ending on January 11, 1946, petitioner owned and operated a retail jewelry store in the District of Columbia. In addition to the usual jewelry sales and repair work, he also engaged in "buying and selling" merchandise. *216 This buying and selling was in effect a pawn shop business. For example, petitioner would purchase a watch from an impecunious owner, hold the watch for a short time and then at a marked-up price resell it to the owner. There was an understanding between petitioner and the owner that for a period of time the watch would not be sold to anyone other than to the original owner. There was a markup on the resale so as to provide petitioner with a profit for the use of his money. If the watch were not reclaimed by the owner, petitioner placed it in his inventory of stock in trade. The average pawn was for about $5 and most of these pawns were negotiated by colored people. Police regulations required petitioner to keep a record of these transactions. During all of the years before us petitioner was also engaged in various real property transactions - buying, selling, and renting. In 1941 petitioner's brother, Joseph Kronstadt, began working in the store as a clerk. Shortly thereafter he managed the store and supervised two or three employees. Later, in January 1946, Joseph purchased the business for $8,000, $3,000 in cash and a note for the balance payable in monthly installments. Petitioner *217 then devoted his time to his realty interests. From 1940 to January 1946 petitioner's books were kept by a part time bookkeeper. Each week she worked one or two hours, usually on Fridays or Saturdays. The bookkeeper made entries in the books from cash register tapes and information supplied by the petitioner, but all of petitioner's business and realty transactions were not entered on these books. Prior to April 1943 petitioner or Joseph collected the rent on petitioner's property, but thereafter real estate agents made the collections. During the investigation of petitioner's returns his bookkeeper gave the revenue agents certain cancelled checks, settlement sheets and rental statements. These records were not complete. The revenue agents did not see petitioner's "books" until after the deficiency notice had been mailed to him, nor did they interview petitioner during their investigation. Petitioner's income as computed by the revenue agents was based on a comparative net worth statement. [1] In preparing respondent's net worth statement for the years before us the revenue agents did not include any asset item entitled "Merchandise Inventory," or "Cash on Hand," nor did they *218 include any liability item entitled "Reserve for Discount on Notes Receivable"; however, petitioner included these items in his net worth statement. The merchandise inventory which was in the store from December 31, 1942, to December 31, 1945, was the property of petitioner. Included in this inventory were items for sale at retail, wholesale, and the pawned merchandise, and his inventory was valued as follows: Retail
Wholesale
Pawned
Year
Merchandise
Merchandise
Merchandise
1942
$2,500
$1,000
$2,000
1943
4,000
1,000
2,000
1944
5,000
1,000
2,000
1945
5,000
1,000
2,000
1946
1,000
1947
1,000
1948
1,000
During the years 1945 through 1948 petitioner was the owner of various notes which he received as part payment in the sale of real property. In 1945 petitioner had one second trust note; in 1946, three; in 1947 and 1948, seven. Petitioner's net worth statement included these notes among his assets at face value, but in addition it contained under *219 liabilities a "Reserve for Discount on Notes Receivable." This reserve was determined as 25 per cent of the declining face value of notes receivable, including a promissory note from Joseph Kronstadt. The parties have stipulated the face value of these notes. The reasonable fair market value of these notes is 75 per cent of face value. Included on the stipulated net worth statement under "Notes Receivable" was Joseph's promissory note; the reasonable market value of this note was the stipulated face value. Between January 1, 1943, and December 31, 1945, petitioner purchased six different parcels of real estate, and produced some $33,600 in cash for these purchases. None of this cash could be traced to bank transfers, real estate sales, or other known transactions. From January 1946 to November 1948 petitioner also bought and sold real estate. In 1948 petitioner purchased over $38,000 of Government bonds. An attorney prepared petitioner's returns for 1943 and 1944. However, one of the bookkeeper's acquaintances, who was also an attorney and certified public accountant, prepared petitioner's returns for the period 1945 through 1948. All of petitioner's returns were prepared from *220 information supplied by him. No independent audit for any year was undertaken by those who prepared his returns. In the latter part of 1945, while petitioner was walking home, he was assaulted, robbed and badly beaten. His health and memory deteriorated after the beating and sometime after January 1946 he moved to New York. His brother, Albert Kronstadt, who lived in New York City, helped him with his business transactions and on March 5, 1949, in a written and later recorded instrument, petitioner "made, constituted and appointed" Albert his true and lawful attorney. Albert was given extensive powers to act for and in place of petitioner. Petitioner did not appear at the hearing. Petitioner filed his Federal income tax returns for the years 1946 through 1948 on or before the dates shown below, and consent agreements for 1946 and 1947 fixing the period of limitation upon assessment of income and profits tax (waivers of the statute of limitations) were executed by him and respondent on the following dates: Return filed
Waivers
Year
prior to
Date Signed
Expired
1946
March 5, 1947
March 13, 1950
June 30, 1952
May 24, 1951
June 30, 1952
1947
May 17, 1948
March 5, 1951
June 30, 1952
1948
March 15, 1949
*221 The notice of deficiency was mailed to petitioner on or before August 15, 1951. Opinion The first issue we shall consider is whether respondent erred in using the comparative net worth method for determining petitioner's taxable income. Respondent maintains that the books and records were incomplete; therefore, income could not be determined from them. On the other hand, petitioner contends that there is no evidence in the record that proves respondent could not determine petitioner's income from his books and records; consequently, petitioner should be sustained. Much of petitioner's argument on this issue is directed to the proposition that respondent's revenue agent or agents did not ask for the "books." There is no question that an agent asked for "records" and in return received from petitioner's bookkeeper certain cancelled checks and other incomplete records. There is evidence that the revenue agents saw the "books" for the first time three years after the initiation of the investigation, and this was after the deficiency notice had been mailed. Regardless of the difference, if any, of the meaning of the words "records" and "books", we think that petitioner and his *222 representatives were fully apprised of respondent's investigation and the fact that respondent wanted all of petitioner's records, including his books. And while, in this case, withholding the books was petitioner's prerogative he can not now complain of something, the use of the comparative net worth method, which results from his recalcitrance alone. Further, we believe as the record in this case has now developed, even if respondent had all of petitioner's written records during the investigation, it would have been impossible to compute an accurate statement of income from his records. Even to this day petitioner has not submitted balance sheets with statements of income prepared from his own written records. Nor is there a showing that an accurate statement of income could be made from his records. This evidence is lacking in spite of the fact petitioner was represented by able counsel, and among his numerous witnesses were certified public accountants and attorneys. The bulk of the testimony elicited from his witnesses was directed at the reconstruction of items on the net worth statement such as his cash on hand and his merchandise inventory. We are not convinced that petitioner's *223 income could be computed from his records. Therefore, it was proper under section 41 of the Code for respondent to use the comparative net worth method in determining petitioner's taxable income. In the discussion on this issue it should be pointed out that there is nothing odious in a comparative net worth statement. The stigma attached to this method, which is frequently relied upon by respondent, results from the fact that the taxpayer or respondent generally emphasizes those items or accounts which favor a partisan result and tend to ignore other items which are not favorable to their position. If a comparative net worth statement, starting with a true net worth and encompassing all of a taxpayer's annual transactions, was prepared by the parties, the net income shown by this statement would be identical to the net income reported on a profit and loss statement made from a double entry set of books embodying the same transactions. The problem lies not in how the information is presented but in what information is included in the net worth statement; we are concerned with this very problem in the second issue. In this second issue we shall consider three items on the net worth *224 statement which are in dispute. Of the 14 named assets, "Cash on Hand" and "Merchandise Inventory" are the center of contention, and of the liabilities only "Reserve for Discount on Notes Receivable" is questioned. All of the other items, such as cash in banks, Government bonds, notes receivable, loans receivable, real estate, estimated living expenses, and Federal income taxes paid were stipulated. For the cash on hand, as distinguished from the cash in banks, petitioner claimed that he had $33,625 in 1942, $29,325 in 1943, and $21,700 in 1944. No cash on hand is claimed for the remaining years. Respondent objected to these contentions and maintains that petitioner did not have any cash on hand. Petitioner reconstructed the alleged cash on hand from the bank balances, deposits, withdrawals, and cash expenditures; however, the keystone of petitioner's reconstruction depended upon certain conclusions of petitioner's accountants who developed the reconstruction. We can not agree with their reconstruction, and examples from their reconstruction will emphasize certain inherent weaknesses in their method. First, on March 9, 1943, petitioner had a bank balance of $1,098.36. On that day *225 he deposited $1,200 in currency; a day later he withdrew $1,921.63 "to settle for purchase" of real property. Again, on March 24, 1943, petitioner's bank balance was $2,202.02; to this he added $3,100 in currency and then withdrew $2,535.52 to purchase real property. Next, on February 29, 1944, his bank balance was $571.66; he deposited $1,550 in coins or currency; the following day he withdrew $2,051.32 to purchase real estate. There were other similar transactions, but their description would only be cumulative. After these transactions were set out, it was the conclusion of petitioner's accountants that the $1,200, the $3,100 and the $1,550 were part of an aggregate, $33,625, cash on hand which petitioner allegedly held on December 31, 1942. In other words, the accountants show a bank balance, a cash bank deposit, and a withdrawal to purchase property. They then conclude that the only source of the deposit was cash on hand. In support of their conclusion they maintained that petitioner must have had that much cash on hand because they knew of no source where petitioner could obtain such sums of money. If their conclusion was to be proof that petitioner had $33,625 cash on hand *226 at the beginning of the period, it would have to be shown that they had omniscient knowledge of all of petitioner's income. But this was not shown, and it appears they only had petitioner's incomplete records when they reconstructed his cash on hand. Petitioner has not proven that he had $33,625 cash on hand on December 31, 1942. However, there is undisputed evidence that petitioner had $10,000 in cash in a store safe in the latter part of 1941. There is no showing that he had this cash, or any part of it, on December 31, 1942, or in any later year. Therefore, on the record as a whole, respondent's determination of cash on hand for 1942, 1943 and 1944 is sustained. Another item in dispute on the comparative net worth statement is petitioner's "Merchandise Inventory." The merchandise inventory that petitioner reported on his tax returns was based on an estimate and not on a stock count. Now petitioner contends that the inventory reported on the tax returns only included merchandise held for retail sale. He alleges that in addition he held jewelry for wholesale purchasers, and an inventory resulting from his pawn business. Originally respondent omitted any merchandise inventory from *227 his net worth statement, but after the hearing he included it. The following table compares the inventory as reported on petitioner's returns, and the inventories as reconstructed by the parties: Peti-
Peti-
Respond-
tioner's
tioner's
ent's
tax
Recon-
Recon-
Year
returns
struction
struction
1942
$2,500
$18,547.74
$3,500
1943
4,000
17,654.58
5,000
1944
5,000
15,869.53
6,000
1945
5,000
14,145.60
6,000
1946
2,000.00
1947
2,000.00
1948
2,000.00
It is interesting to note how these inventory figures were reconstructed. The record supports a finding that on January 11, 1946, at the time the store was sold to petitioner's brother, the inventory at cost was valued at $10,145.60. Respondent admits that this includes approximately $2,000 of merchandise held as a result of the pawn business. Since petitioner sold the business to his brother for $8,000, respondent subtracted $5,000 (the closing inventory reported on the 1945 tax return), and $2,000 (the pawn inventory) from $8,000 to obtain a wholesale inventory of $1,000. Now respondent admits that the merchandise inventory was the aggregate of the inventory reported on *228 the tax returns plus $1,000 a year from 1942 through 1945 for the wholesale inventory. No allowance was made for petitioner's pawn inventory even though he held title to it. On the other hand, petitioner's inventory reconstruction also originated with the January 1946 figure. He contends that the $10,145.60 did not include certain items of jewelry, diamonds, and gold valued at $4,000. These items were not sold to his brother, and he continued to hold them after January 1946. Petitioner conservatively included $2,000 of this $4,000 in his net worth statement for 1946 through 1948. The accounts reconstructed the inventory for the years prior to January 1946 from alleged purchases, sales and markup. This method of reconstruction requires accurate data, and since the accuracy of petitioner's books is doubtful, we doubt the accuracy of the reconstruction. Further, there is no showing that petitioner used a 20 per cent markup which is the value used by his accountants in their reconstruction. We can not agree with the reconstruction as presented by either party; nevertheless inventory should be included on the net worth statement. A proper merchandise inventory would include petitioner's *229 retail stock in trade, his wholesale stock, and his pawned merchandise. On petitioner's returns he included the amounts of his retail stock in trade. To this should be added $1,000 a year for 1942 through 1948 for his wholesale merchandise, and $2,000 a year for 1942 through 1945 for his pawned merchandise. The summation of these three for each year will total petitioner's merchandise inventory for the years before us. The remaining item in dispute on the net worth statement is the "Reserve for Discount on Notes Receivable" for 1945 through 1948. Petitioner contends that the value of notes, which are not first trust notes, is less than face value. To account for this devaluation in his net worth statement petitioner set up as a liability account a reserve amounting to 25 per cent of the declining value of his notes receivable. Respondent asserts that this reserve should not be included in the net worth statement. Actually what petitioner has attempted with the reserve account is to value his notes at fair market value. We think that petitioner's position is sound for under section 111(b) of the Code the amount realized from the sale of property is the sum of money received plus *230 the fair market value of the property (other than money) received. Walnut Realty Trust, 23 B.T.A. 850; cf. A. & A. Tool & Supply Co. v. Commissioner, 182 Fed. (2d) 300. The question arises, however, what is the proper discount for these notes? The record indicates that notes like petitioner owned were sometimes discounted at 50 per cent but generally the discount ranged between 25 and 40 per cent. We have found that the fair market value of these notes was 75 per cent of face value; therefore, a reserve based on 25 per cent of the declining face value of the trust notes is proper. On this petitioner is sustained. However, among petitioner's notes receivable was Joseph's promissory note. There was no showing that this was anything but an ordinary promissory note. It was not a second trust note, nor was it established that in 1946, 1947 or 1948 the note was worth less than face value. Therefore, Joseph's promissory note must be included on the net worth statement at face value without a reserve. In this respondent is sustained. The third issue is whether any part of the deficiencies was due to fraud with intent to evade tax. The burden of proof is upon *231 the respondent to establish fraud, and the evidence must be clear and convincing. Considering all of the evidence and the record as a whole, we find and so hold that respondent has failed to meet his burden of proof, and accordingly on the issue of fraud the petitioner is sustained. The fourth and final issue in this proceeding involves the statute of limitations. Petitioner contends that all the years except 1948 are barred under section 275 of the Code. Respondent admits that, unless there was fraud, the statute has run for the years 1943 through 1945. Accordingly, we sustain petitioner's plea of limitation as to the years 1943, 1944 and 1945. As to the years 1946 and 1947, respondent contends the period for assessment and collection has been extended by waiver. There is no question concerning the fact that waivers were executed by petitioner and respondent for the years 1946 and 1947, but petitioner's counsel argues that petitioner's knowledge and memory did not permit him to understand the nature of the papers he signed. Petitioner did not appear at the hearing, nor did the revenue agents question him at any time during their investigation prior to the hearing. The agents refrained *232 from questioning petitioner because they were advised that an investigation would have an injurious effect on his health. There was testimony that petitioner was not in good health, that his memory was bad, and that he would have difficulty in understanding the tax problems presented in this proceeding. A physician's affidavit to this effect, dated November 23, 1953, was also introduced in evidence, but the doctor did not testify. The evidence evincing petitioner's incompetence and lack of understanding does not stand uncontroverted. First, during the years of petitioner's alleged memory failure, that is, from 1945 on, he still bought and sold real property. In 1949 he was competent enough to give his brother a power of attorney. Finally, there was no showing that it was necessary to entrust petitioner's interests to a committee. Considering the evidence and arguments of both parties, we believe it is not shown that petitioner was incompetent or that he did not know what he was doing when he signed the waivers. Therefore, the years 1946 and 1947 are not barred by the period of limitations upon assessment and collection, and respondent is sustained for these years. Decision will *233 be entered under Rule 50. Footnotes
1. In this proceeding three net worth statements are considered: (1) petitioner's, (2) respondent's, and (3) the stipulated statement which is a combination of the other two.↩